IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Tiffani Stephenson,

                Plaintiff,                Case No. 3:13-cv-1198

      -vs-

                                            MEMORANDUM OPINION
                                            AND ORDER

Commissioner of Social Security,

                Defendant.

      Tiffani Stephenson applied for social security disability insurance benefits and for supplemental security income benefits with the Social Security Administration. After exhausting her available administrative remedies, the Commissioner of Social Security denied Ms. Stephenson's applications for benefits.

      Ms. Stephenson then sought judicial review of the Commissioner's decision. The case was referred to Magistrate Judge James R. Knepp II for findings of facts, conclusions of law, and recommendations. The Magistrate Judge issued a report recommending I affirm the Commissioner's decision denying Ms. Stephenson's applications for benefits. This matter is before me pursuant to Ms. Stephenson's timely objections to the Magistrate Judge's report. The Commissioner has filed a response to Ms. Stephenson's objections.

      I have jurisdiction over the Commissioner's final decision denying Ms. Stephenson's request for benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832 (6th Cir. 2006). In accordance with *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001), I have made a de novo determination of the Magistrate Judge's report. For the reasons

stated below, I adopt the report and affirm the Commissioner's decision denying Ms. Stephenson's applications for benefits.

## I. STANDARD OF REVIEW

I have conducted a de novo review of those portions of the Magistrate Judge's report to which Ms. Stephenson objects. 28 U.S.C. § 636(b)(1). In so doing, I have reviewed the Commissioner's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g). I "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). I do not re-weigh the evidence, but must affirm the Commissioner's findings as long as there is substantial evidence to support those findings, even if I would have decided the matter differently, and even if there is substantial evidence supporting the claimant's position. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citations and internal quotation marks omitted). The Commissioner's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Id.* at 854–55.

## II. DISCUSSION

Because Ms. Stephenson has not objected to the Magistrate Judge's factual summary of the case as set forth on pages one through seven of the report, I adopt the Magistrate Judge's findings. The Magistrate Judge's uncontested summary of the case is as follows:

> On August 24, 2009, Plaintiff filed applications for DIB and SSI benefits claiming lymphedema in her left leg limited her ability to work. (Tr. 14, 152, 159,

207). Her claims were denied initially and on reconsideration. (Tr. 59, 62, 67, 70). Plaintiff requested a hearing before an administrative law judge (ALJ), which was held November 9, 2011. (Tr. 26). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 11, 26). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On April 2, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

*Plaintiff's Vocational and Personal Background*

Born December 22, 1978, Plaintiff was 30 years old at the time of her alleged disability onset date of June 13, 2009. (Tr. 16, 19). She has a high school education and prior relevant work experience as an assembler, straightening press operator, bartender, pizza baker, and waitress. (Tr. 19).

Plaintiff was enrolled in online accounting classes but stopped when her father's internet connection was cancelled. (Tr. 32, 39-40). While taking classes, Plaintiff sat for three hours per day with her foot elevated at the desk. (Tr. 40). There is limited evidence of Plaintiff's daily activities, only that she did laundry and dishes. (Tr. 40). Plaintiff raised her foot on a stool while standing at the sink and also had some help from her thirteen-year-old daughter. (Tr. 40). Plaintiff attended approximately four of her daughter's volleyball games during one season. (Tr. 40-41).

Plaintiff claimed severe swelling in her left leg prevented her from standing for more than one or two hours and required frequent elevation and 24-hour compression therapy. (Tr. 35-36, 207). She averred swelling reduced her ability to sleep at night causing extreme fatigue during the day. (Tr. 207). Plaintiff told her attorney she did not have any other "problems" besides her left leg swelling (Tr. 34), but when questioned by the ALJ, claimed she suffered from extreme medication side-effects including headaches and shaking (Tr. 39).

*Medical Evidence*

Plaintiff visited James Byatt, M.D., on August 7, 2008, the day after she went to the emergency room for chest pain. (Tr. 244, 258). Dr. Byatt recounted that at the hospital, all chest examinations were normal and Plaintiff was discharged and advised to avoid fatty food. (Tr. 258). Plaintiff complained of sudden onset and persistent pain, nausea, and vomiting. (Tr. 244). Previously, given her past history of melanoma and lack of treatment since surgery, Dr. Byatt referred Plaintiff to a dermatologist and noted examinations there came back "fairly normal". (Tr. 244). Physical examination revealed chest and abdominal pain with Murphy's sign suggestive of acute cholecytitis. (Tr. 244). Dr. Byatt referred Plaintiff to a surgery consultation and initiated a medication regimen. (Tr. 245).

Also on August 7, 2008, Michael Bielefeld, M.D., examined Plaintiff, assessed cholelithiasis and possible cholecystitis, and recommended a laparoscopic cholecystectomy, which Plaintiff underwent that day. (Tr. 246, 249). The procedure revealed numerous small gallstones. (Tr. 250).

More than seven months later, from March 20 to 21, 2009, Plaintiff was treated at the emergency room for a cat bite and subsequent allergic reaction. (Tr. 232, 238). She was described as a "relatively healthy 30 year old" who smoked approximately one pack per day for the past fifteen years. (Tr. 232).

On June 17, 2009, a left venous scan of Plaintiff's lower extremity revealed no evidence of proximal deep vein thrombosis of the left lower extremity. (Tr. 228). Dr. Byatt indicated Plaintiff's pain presented a significant problem and would send her to vascular surgery to see what else could be done as he was unfamiliar with the specialized equipment possibly needed to treat Plaintiff. (Tr. 286).

Andrew J. Selwert, M.D., evaluated Plaintiff at Dr. Byatt's request on July 6, 2009. (Tr. 278). Plaintiff recounted a history of melanoma and left inguinal lymphadenectomy. (Tr. 278). She said her left leg swelling was worse at the day's end and exacerbated by warm weather and recent weight gain. (Tr. 278). An Ace wrap improved Plaintiff's symptoms but she did not use it on a regular basis. (Tr. 278). Plaintiff averred there was some clear drainage from the center of her posterior calf scar when her legs were markedly swollen. (Tr. 278). Having been laid off, she told Dr. Sewert she gained new employment and would soon return to the work force with prolonged standing. (Tr. 278). Dr. Sewert referred Plaintiff for treatment at the Lymphedema Clinic and asked to see her in six-to-eight weeks, when treatment would be completed. (Tr. 279).

Todd E. Russell, M.D., updated Dr. Byatt on October 19, 2009, indicating the Lymphedema Clinic had "done a nice job" of getting Plaintiff's swelling under "good control" and noting Plaintiff's calf was half the size it was prior to treatment. (Tr. 277). However, Dr. Russell indicated Plaintiff continued to have significant pain in her lower left extremity. (Tr. 277). It seemed unusual to Dr. Russell for Plaintiff to have so much lymphedema pain when for most people, the swelling was relatively painless. (Tr. 277). Dr. Russell encouraged Plaintiff to continue compression therapy and recommended further testing to determine the source of Plaintiff's pain. (Tr. 277).

On November 23, 2009, Plaintiff underwent a venous duplex bilateral examination which revealed no evidence of deep vein thrombosis, superficial venous thrombosis, or venous valvular insufficiency in either leg. (Tr. 226).

After completing a round of treatment at the Lymphedema Clinic, Dr. Selwert, M.D., wrote to Dr. Byatt on December 7, 2009, indicating Plaintiff had a "somewhat favorable response" to treatment, including use of compression stockings. (Tr. 276). However, Plaintiff said her level of function remained less than optimal because she was unable to squat down on the floor to play with her children. (Tr. 276). Clinically, Plaintiff's legs showed no sign of venous hypertension and a Lympha Press vastly improved her symptoms. (Tr. 276). On examination, Plaintiff's lower left extremity was considerably more swollen than her right but there was no sign of ulceration near the calf and the thigh had nearly normal tissue turgor. (Tr. 276). Further, there were no prominent varices over the groin on the left side. (Tr. 276). Dr. Selwert encouraged Plaintiff to be as active as possible and to use chaps to keep her stockings from slipping down her leg. (Tr. 276). Dr. Selwert said the probability of May-Thurner syndrome was low and asked to see Plaintiff again in six months. (Tr. 276).

On January 7, 2010, Dr. Byatt prescribed Sinernet to reduce symptoms of restless leg syndrome and Darvocet-N to address Plaintiff's upset stomach caused by taking "huge quantities of over-the-counter ibuprofen". (Tr. 324). Plaintiff complained of bilateral neuropathic symptoms and denied back pain even though

4

she exhibited lower spine tenderness and had positive straight leg raise tests. (Tr. 324). Dr. Byatt noted Plaintiff's weight had been "steadily sneaking up", which Plaintiff attributed to the consumption of a high volume of regular soda and being laid off from her job. (Tr. 324).

On January 13, 2010, an MRI of Plaintiff's lumbar spine was unremarkable. (Tr. 329-30). About three weeks later, Dr. Byatt indicated Plaintiff was sleeping better and referred her to physical therapy to address increased knee pain. (Tr. 323).

Dr. Byatt examined Plaintiff on April 22, 2010, for the Ohio Department of Job and Family Services where he indicated Plaintiff suffered from persistent severe lymphedema of the left leg. (Tr. 321). At the time, Dr. Byatt said Plaintiff's treatment schedule at the Lymphedema Clinic prevented her from being able to hold a job. (Tr. 321). Dr. Byatt opined Plaintiff could not stand, walk, or sit during an eight hour workday. (Tr. 322). She was unable to lift or carry more than five pounds frequently and eight-to-ten pounds occasionally and was markedly limited in abilities to push, pull, bend, reach, and perform repetitive foot movements. (Tr. 322). Dr. Byatt considered Plaintiff unemployable. (Tr. 322).

On June 16, 2010, an interventional venography of Plaintiff's left extremity was unremarkable, ruling out May-Thurner syndrome and revealing only trace deep femoral reflux on the left side. (Tr. 304).

On September 10, 2010, Plaintiff was depressed after her significant other left her. (Tr. 320). Dr. Byatt prescribed Zanax and asked to see Plaintiff again in two weeks. (Tr. 320).

Plaintiff followed up with Dr. Byatt on September 24, 2010, and indicated her biggest problem was that she had broken up with her boyfriend of twenty years. (Tr. 319). Plaintiff took Darvocet semi-regularly for lymphedema pain and hoped to reenter the workforce. (Tr. 319).

On March 3, 2011, Dr. Byatt adjusted Plaintiff's medication but indicated Lyrica "really helped" the neuropathy in Plaintiff's leg. (Tr. 318). Tylenol 3 was also effective but upset her stomach, so Tramadol was prescribed instead. (Tr. 318). Dr. Byatt indicated Plaintiff was taking "15 classes this semester" in an effort to obtain a bachelor's degree in accounting and looked "wonderful". (Tr. 318).

Dr. Byatt completed a medical source questionnaire on April 4, 2011, where he indicated Plaintiff's symptoms included chronic painful swelling of the left leg with burning paresthesia and hyperesthesia. (Tr. 315). He opined Plaintiff could sit, stand, or walk for up to half-an-hour in an eight-hour workday. (Tr. 315). Plaintiff could lift up to fifteen pounds occasionally and would need unscheduled breaks every half-hour. (Tr. 333). She could be expected to miss up to five days of work per month. (Tr. 333). Treatment notes from the same day indicated Plaintiff presented with disability paperwork but was trying to advance herself by going to school online. (Tr. 317). However, Dr. Byatt said she could not work because she had to frequently change position. (Tr. 317).

**Disability Related Development**

State agency medical consultant Leigh Thomas, M.D., reviewed Plaintiff's records and completed a physical residual functioning capacity (RFC) assessment on November 25, 2009, where she opined Plaintiff could perform a full range of light work except she could lift or carry up to twenty pounds occasionally and ten pound

frequently, stand or walk for at least two hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull without limitation. (Tr. 295-96). On April 22, 2010, Edmond Gardner, M.D., affirmed Dr. Thomas's RFC determination. (Tr. 225).

**ALJ Decision**

On November 23, 2011, the ALJ determined Plaintiff had the severe impairment of left leg lymphedema. (Tr. 11, 16). The ALJ found this impairment did not meet or medically equal a listed impairment. (Tr. 16-17).

Plaintiff had the RFC to stand and walk at the sedentary exertional level and lift and carry at the light exertional level, except that her lifting and carrying was limited to no more than fifteen pounds occasionally and she would not be required to stand or walk for more than a few minutes at a time. (Tr. 17). Further, Plaintiff required a sit/stand option; was restricted to no more than occasional stooping; and was precluded from climbing, kneeling, crouching, or crawling. (Tr. 17). Plaintiff could not use her left lower extremity for pushing, pulling, or operating foot controls and should avoid exposure to extreme heat. (Tr. 17). Based on VE testimony, the ALJ concluded Plaintiff could perform work as an information clerk, call-out operator, and telephone solicitor, and was therefore, not disabled. (Tr. 20).

### III. STEPHENSON'S ARGUMENTS

Ms. Stephenson objects to the ALJ's credibility determination. Credibility determinations regarding an applicant's subjective complaints rest with the ALJ and must be supported by objective evidence in the record. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). In assessing an individual's credibility, the ALJ must first determine whether a claimant has a medically determinable physical or mental impairment which can reasonably be expected to produce the symptoms alleged. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). The ALJ found Ms. Stephenson had such an impairment. Next, the ALJ must evaluate the intensity, persistence, and functional limitations of the symptoms by considering objective medical evidence, as well as other factors. *Id.*

The ALJ stated after carefully considering the evidence, he found Ms. Stephenson's impairment could reasonably be expected to cause some of her alleged symptoms. (Tr. 21). However, Ms. Stephenson's statements concerning the intensity, persistence, and limiting effects of

the symptoms were not credible to the extent they were inconsistent with his residual functional capacity assessment.  (Tr. 21).

     The ALJ explained there were several factors which damaged Ms. Stephenson's credibility as to the severity of her impairments.  (Tr. 21).  The ALJ noted, contrary to her testimony, that Ms. Stephenson indicated in documentary submissions to the Social Security Administration she suffered no adverse side effects to her prescribed medications.  (Tr. 21).  The ALJ stated the medical evidence did not substantiate Ms. Stephenson's testimony of severe headaches and need to elevate her leg throughout the day.  (Tr. 21).  Ms. Stephenson had indicated she engaged in a variety of daily activities including laundry, dishwashing, periodic attendance at her children's sporting events, and college classes.  (Tr. 21).  Ms. Stephenson reported taking a full course load in accounting at an online school which required her to sit for three hours each day.  (Tr. 21).  Ms. Stephenson stated she discontinued taking classes due to the lack of internet access and not because of her impairments.  (Tr. 21).

     I find the ALJ's excellent explanation of his credibility determination supported by substantial evidence.  *See Jones*, 336 F.3d at 476.  The ALJ properly evaluated Ms. Stephenson's condition in accordance with *Rogers*.  Therefore, Ms. Stephenson's objection regarding the ALJ's credibility determination is overruled.

     Ms. Stephenson contends the ALJ's residual functional capacity assessment is not supported by substantial evidence.  In making his residual functional capacity assessment, the ALJ explained he considered all of Ms. Stephenson's symptoms which were consistent with the objective medical evidence and the other evidence in the record.  (Tr. 20).  The ALJ noted he attempted to afford Ms. Stephenson the benefit of the doubt and even accorded in his assessment limitations which were even greater than those alleged by Ms. Stephenson.  (Tr. 20).  Specifically, the ALJ stated Ms.

Stephenson testified she could stand continuously for up to one hour. However, he restricted Ms. Stephenson to being able to stand or walk for no more than a few minutes at a time. (Tr. 20).

Ms. Stephenson argues the ALJ should have found she was required to have her leg elevated throughout the day. However, this proposed restriction is contradicted by Ms. Stephenson's own admission regarding her ability to stand continuously for up to one hour. (Tr. 20). Further, the medical evidence, as summarized by the ALJ, establishes Ms. Stephenson's leg swelling was "vastly improved" following treatment and her current medication significantly reduced her lower extremity pain. (Tr. 21). Ms. Stephenson's proposed restriction regarding the constant elevation of her leg is not corroborated by objective medical evidence. Accordingly, I find the ALJ's residual functional capacity assessment supported by substantial evidence.

Ms. Stephenson asserts the ALJ violated the treating physician rule regarding his evaluation of Dr. James Byatt's residual functional capacity assessment. The controlling decision on this issue is *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011). In *Cole*, the court noted the Commissioner has elected to impose certain standards on the treatment of "medical source evidence." *Cole*, 661 F.3d at 937. Under what is commonly known as the "treating physician rule," *Cole*, 661 F.3d at 937, the Commissioner requires an ALJ to give a treating physician's opinion controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (citation omitted).

The ALJ stated he adopted Dr. Byatt's limitations regarding Ms. Stephenson's ability to work with two exceptions. The ALJ noted Dr. Byatt stated Ms. Stephenson could stand and walk a total of thirty minutes in an eight hour day. The ALJ stated this restriction was contradicted by Ms. Stephenson's admission she could continuously stand for up to one hour.

Dr. Byatt also indicated Ms. Stephenson would require unscheduled breaks every thirty

8

minutes and would miss five days of work a month. However, the record showed Ms. Stephenson's medication and compression wraps effectively controlled her symptoms. The ALJ further noted Ms. Stephenson was able to sit daily for three hours to take classes on the internet. Because the two exceptions noted by the ALJ were inconsistent with the record, the ALJ did not err in refusing to accept Dr. Byatt's opinion regarding these restrictions. *Id.* Accordingly, I find the Commissioner's decision on this issue supported by substantial evidence.

## IV. CONCLUSION

Accordingly, the Magistrate Judge's report and recommendation is adopted and the Commissioner's denial of Ms. Stephenson's applications for social security disability insurance benefits and for supplemental security income benefits is affirmed.

So Ordered.

    s/ *Jeffrey J. Helmick*
United States District Judge